**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

NOAH BROWN,                                    :
                                               :
                    Plaintiff,                 :
                                               :
v.                                             :            NO. 3:08cv1478 (MRK)
                                               :
STATE OF CONNECTICUT,                          :
DEPARTMENT OF CHILDREN AND                     :
FAMILIES, JOHN W. SULLIVAN,                    :
SARAH NEWKIRK, JOHN MATTERA,                   :
BARBARA MULE, and                              :
JEANNE GAVEY,                                  :
individually and in their official capacities, :
                                               :
                    Defendants.                :

**MEMORANDUM OF DECISION**

        Noah Brown, a former teacher of the Walter G. Cady School ("the Cady School") at the

Connecticut Juvenile Training School ("CJTS"), has brought suit against the State of Connecticut

Department of Children and Families ("DCF") and three of its employees (collectively,

"Defendants").[1] Mr. Brown's Complaint [doc. # 1] asserts six claims related to termination of his

employment on or about November 10, 2006: race discrimination in employment, in violation of

Title VII of the Civil Rights Act of 1964 (Count One) and the Connecticut Fair Employment

Protection Act ("CFEPA") (Count Two); race, age, and disability discrimination, in violation of the

Equal Protection Clause of the Fourteenth Amendment (Count Three); race discrimination in

_____

[1] Mr. Brown initially named two additional defendants, Sarah Newkirk and Barbara Mule, but in his
Memorandum in Opposition to Summary Judgment [doc. # 44] at 25, Mr. Brown agreed that
dismissal of the claims against them is appropriate, and therefore those claims are no longer before
the Court.

violation of 42 U.S.C. § 1981 (Count Four); a violation of the Rehabilitation Act (Count Six); and a violation of Title II of the Americans with Disabilities Act ("ADA") (Count Seven).[2] Following the close of discovery, the Defendants moved for summary judgment. *See* Defs.' Mot. for Summary J. [doc. # 38].  The Court heard oral argument on the motion on February 26, 2010.  On the basis of the parties' arguments and the record before it, the Court concludes that there are no genuine disputes of material fact regarding any of Mr. Brown's claims and that the Defendants are entitled to judgment as a matter of law.  Therefore, for the reasons explained below, Defendants' Motion for Summary Judgment [doc. # 38] is GRANTED.

## I.

The following facts are taken from the parties' statements of material facts not in dispute. *See* Defs.' Local Rule 56(a)1 Statement [doc. # 38-3]; Pl.'s Local Rule 56(a)2 Statement [doc. # 43]. Unless otherwise indicated, they are not contested.  The Court assumes the parties' familiarity with the factual background and procedural history to date, and will only set forth those facts necessary for the resolution of Defendants' motion.  Additional facts will be introduced as necessary in discussing Mr. Brown's individual claims.

Mr. Brown began working as a vocational instructor for the DCF at the Cady School in August 2002.  Mr. Brown, who was one of two African-American teachers at the school and was 61 years old at the time of his termination, taught trade-related subjects and math, though he was not certified to teach the latter.  Mr. Brown also taught (and again teaches) trade-related subjects at another school, Stepping Stone, where he started working part-time in late 2005.

---

[2] Following oral argument on the motion for summary judgment, the parties stipulated to a dismissal of Count Five, which asserted a violation of the Due Process Clause of the Fourteenth Amendment.

Sometime in early 2006, the Connecticut Department of Education ("DOE") informed the Cady School that three of its teachers – Mr. Brown, Michael Angelone, and Mark Shirley – did not hold the proper certification (the "098" certificate) to teach at a comprehensive school such as the Cady School.[3]  The DOE informed Mr. Brown that he did not have the required certificate around the same time.  In July 2006, the principal of the school, Defendant John Mattera, met with Mr. Brown to discuss a number of issues, including allegations that Mr. Brown had violated certain safety policies of the school.  There is some disagreement about what else was discussed during this meeting, as well as its outcome – Mr. Brown says that the 098 certification was not discussed, but Mr. Mattera says otherwise; and Mr. Brown says he was placed on a "Level II Intervention Phase," which the Defendants dispute.  However, these disagreements are not particularly material to Mr. Brown's claims.

The parties do not dispute that another meeting was held in September 2006 involving Mr. Brown; his union representative; Mr. Mattera; and Defendant Jeanne Gavey, the Principal Personnel Officer at DCF.  At this meeting, Mr. Brown was informed that DCF was considering terminating his employment because he did not have the necessary 098 certification to teach at the Cady School. By this time, Mark Shirley had received his 098 certification, while Mr. Angelone had left to teach at a school that did not require the certificate, meaning that Mr. Brown was the only teacher remaining at the Cady School who had not obtained the required certification.  During the September 2006 meeting or shortly thereafter, Mr. Brown apparently agreed to apply for the 098

_See_ Stipulation of Dismissal [doc. # 48].

[3] The DOE did not learn of this fact earlier due to a problem with its compliance process.  This glitch was discovered and rectified after the issue arose in regards to a different school.  _See_ Dep. of Nancy Pugliese, Ex. E to Pl.'s Mem. in Opp'n to Mot. for Summary J. [doc. # 44] at 7-8.

certification.  After determining that the application process would take approximately four to eight weeks, Ms. Gavey recommended to her supervisors that Mr. Brown be permitted to remain at the Cady School while his application was pending.  On that recommendation, Mr. Brown continued working at the Cady School as a substitute teacher and a vocational assistant (though DCF continued to pay him as if he were still working as a vocational instructor).  During this time, Mr. Brown was also preparing a computer laboratory in anticipation of teaching computer-related courses once he was properly certified.

Mr. Brown submitted his application for the 098 certificate on or about September 22, 2006. Approximately a month earlier, however, Mr. Brown had applied for a "047" certificate to teach technology classes.  This not the first time that Mr. Brown had applied for the 047 certificate.  He previously applied for the 047 certificate in 1997, but the Connecticut Department of Education ("DOE") had denied his application, explaining in its letter that he needed to complete additional coursework and to take a required examination.  *See* 1997 DOE Denial Letter, Ex. 8 to Defs.' Mem. in Supp. of Summ. J. (hereinafter, "Defs.' Mem.") [doc. # 38].  In reapplying for the 047 certification in 2006, Mr. Brown represented to the DOE that he had *not* been advised of the examination requirement, submitting as "proof" the 1997 denial letter, which he altered by deleting the line of the letter regarding the required examination.  *See id.*  Upon receipt of Mr. Brown's 047 application in 2006, the DOE retrieved the original 1997 letter from its archives, compared the two, and discovered Mr. Brown's alteration of the 1997 letter.  By that time, the DOE had also received Mr. Brown's 098 certificate application, and by letter dated October 2, 2006, the DOE notified Mr. Brown that both his 098 and 047 certificate applications were denied due to his falsification of the 1997 letter.  *See* DOE Letter dated Oct. 2, 2006, Ex. 7 to Defs.' Mem. [doc. # 38]; Conn. Gen. Stat. § 10-145b(j)(3)

4

(providing that teaching certificate applications may be denied when, *inter alia*, "[t]he applicant seeks to obtain a certificate . . . through fraud or misrepresentation of a material fact").[4]

Shortly thereafter, someone – either a union representative or Defendant John Sullivan, the superintendent of the Cady School – informed Ms. Gavey of the denial, but not its specifics.  Mr. Sullivan suggested that Ms. Gavey call Nancy Pugliese, the Chief of the DOE's Bureau of Educator Preparation, to try to learn more.  When Ms. Gavey called, Ms. Pugliese told her that Mr. Brown's certification had been denied, but that she could not provide additional information.  Ms. Gavey asked whether the school could obtain more information through a request under the state Freedom of Information ("FOI") Act, and Ms. Pugliese confirmed that it could.  Therefore, on October 10, 2006, Ms. Gavey sent a FOI request to the DOE for information about the denial.  *See* Letter dated Oct. 10, 2006, Ex. 9 to Defs.' Mem. [doc. # 38].

The DOE, through Ms. Pugliese, responded by letter dated October 12, forwarding copies of the altered and original letters, as well a copy of the October 2, 2006 letter denying Mr. Brown's 098 and 047 certificate applications.  *See* Letter dated Oct. 12, 2006, Ex. 9 to Defs.' Mem. [doc. # 38].  Upon receipt of the FOI response, Ms. Gavey immediately contacted her superior, non-party Jeannette Perez, to ask for guidance.  Ms. Perez advised Ms. Gavey to have another meeting with Mr. Brown to inform him of the information the school had received and to tell him that the school was contemplating terminating his employment for not having the 098 certification.  At some point in this same time period, Mr. Sullivan also called Ms. Pugliese to discuss the denial of Mr. Brown's application.  Mr. Sullivan testified that Ms. Pugliese told him that the state would never approve a future certification request from Mr. Brown due to his apparent fraud; Ms. Pugliese, however,

---

[4] Mr. Brown later appealed this decision, but it was upheld by a review panel in late November 2006.

testified that she did not recall speaking to Mr. Sullivan or making that statement to anyone. *See* Dep. of Nancy Pugliese, Ex. E to Pl.'s Mem. in Opp'n to Mot. for Summ. J. (hereinafter, "Pl.'s Mem.") [doc. # 44] at 10.

On October 25, Mr. Brown was notified via a hand-delivered letter from Ms. Gavey that he was expected to attend a meeting the following day to discuss his employment status with DCF. *See* Letter dated Oct. 25, 2006, Ex. 9 to Defs.' Mem. [doc. # 38] ("[W]e have been advised by the Department of Education that they have declined your application for the 098 certification. As such, you are not eligible to serve as a Vocational Instructor at CJTS. We are considering a non-disciplinary separation of you from your position."). The meeting took place the next day, and included Mr. Mattera, Ms. Gavey, Mr. Brown, and his union representative, Joanna James. The record is ambiguous as to whether Mr. Brown was definitively told during this meeting that he was being terminated for his failure to hold the required 098 certificate, but that implication was evidently clear. Ms. James states that she requested during the meeting that Mr. Brown be moved into another position while appealing the denial of his 098 application, but that request was refused; the parties agree that the same request was subsequently made by the union, but that it was denied. The parties also seem to agree that Mr. Brown indicated during the meeting that he would be making a request to take sick leave because of the stress his employment situation was causing him.

According to Defendants, they caucused after the October 26 meeting and decided that Mr. Brown would be separated from his employment. The following day, Mr. Brown was officially notified of this decision via a letter from Mr. Mattera, which stated that he would be terminated effective November 10, 2006 due to his lack of proper certification. *See* Letter dated Oct. 27, 2006, Ex. 11 to Defs.' Mem. [doc. # 38]. In accordance with a state statute, Mr. Brown was placed on

6

administrative leave with pay for the intervening two weeks.  *See id.*  Mr. Brown sent letters addressed to Ms. Gavey and Mr. Mattera that were delivered to the school on October 30 and November 10, 2006, respectively, stating that he would be requesting sick leave due to the stress caused by his termination.  *See* Letters, Ex. U to Pl.'s Mem. [doc. # 44].  However, Mr. Brown did not mail the paperwork required to take sick leave until November 10, 2006 – the day his termination was effective.  His request asked for sick leave from November 27 until December 8, 2006.  *See* Ex. 15 to Defs.' Mem. [doc. # 38].  Since it was received after his termination, the request was not processed.

The parties are in agreement that this was the first time that Mr. Brown had submitted a formal request for sick leave.  Mr. Brown had, however, taken sick leave on September 11 through 13, 2006.  Pursuant to DCF policy, Mr. Brown was sent forms on September 14, 2006 requesting that he provide medical documentation so that he could be considered for leave under the Family and Medical Leave Act (FMLA).  Mr. Brown was sent a second, similar request on October 3, 2006.  When he had not returned the forms by October 20, 2006, Mr. Brown was sent a FMLA denial letter.  *See* Ex. 14 to Defs.' Mem. [doc. # 38].  In regards to his allegations that he was terminated due to one or more disabilities – which Mr. Brown has identified as post-traumatic stress disorder ("PTSD") and depression – Mr. Brown testified that he had a conversation with Mr. Mattera sometime in 2006 (prior to his termination) in which Mr. Mattera asked him if had some kind of illness.  *See* Dep. of Noah Brown, Ex. A to Pl.'s Mem. [doc. # 44] at 58.  Mr. Brown testified that he did not give Mr. Mattera any information, apparently denying that he was ill in any way.  *See id.*  Mr. Brown also confirmed that he did not inform anyone at the school that he was suffering from PTSD or depression until he submitted the sick leave requests after his termination.  Mr. Brown also

did not allege or mention discrimination due to disability in his complaint to the Commission of Human Rights and Opportunities ("CHRO"), which he filed in December 2006.

Sometime in January 2007, Stepping Stone notified Mr. Brown that he needed a 098 certification to teach at that school as well, and a few days later he was terminated from Stepping Stone school for not having it the required certification. *See* Dep. of Noah Brown, Ex. 2 to Defs.' Mem. [doc. # 38] at 20-21.  Mr. Brown reapplied for a 098 certification shortly thereafter.  The renewed application was approved in May 2007, but that certification was specific to Stepping Stone school; Mr. Brown returned to work there once he was properly certified. *See id.* at 52-55.  Later, in September 2007, Mr. Brown was approved for a 098 certificate that was not school-specific. *See id.* While Mr. Brown did request reinstatement (and other relief) as part of the CHRO process, it is undisputed that he never applied to DCF for any position since his termination in November 2006.

Following the CHRO's release of jurisdiction, Mr. Brown filed this suit on September 26, 2008. *See* Compl. [doc. # 1].

## II.

The standard for considering a motion for summary judgment is a familiar one.  The purpose of summary judgment is not to resolve factual disputes, but rather to see if there *are* any facts material to a claim that remain in genuine dispute.  Accordingly, summary judgment is appropriate only when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted).  "The

8

substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986), and the Court must resolve all ambiguities and draw all inferences in favor of the nonmoving party, *see Anderson*, 477 U.S. at 255; *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). If the moving party carries its burden, the party opposing summary judgment "may not rely merely on allegations or denials." Fed. R. Civ. P. 56(e)(2). Rather, the opposing party must "set out specific facts showing a genuine issue for trial." *Id.* In short, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

Courts should be "particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question. Because direct evidence of an employer's discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (citations and quotation marks omitted). That said, "[s]ummary judgment is appropriate even in discrimination cases," *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000), where a plaintiff's opposition is "based on conclusory allegations of discrimination and the employer provides a legitimate rationale for its conduct." *Tojzan v. N.Y.*

9

*Presbyterian Hosp.*, No. 00CV6105, 2003 WL 1738993, at *4 (S.D.N.Y. Mar. 31, 2003).

### III.

The Court first considers Mr. Brown's claims of race discrimination under Title VII, 42 U.S.C. § 2000e *et seq.* Title VII claims are analyzed under the three-step burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See also Burlington Northern v. White*, 548 U.S. 53, 67 (2006). To survive summary judgment, Mr. Brown must first establish a prima facie case of discrimination by demonstrating that: (1) he is a member of a protected class; (2) he is qualified for the position he held or sought; (3) he suffered an adverse employment action; and (4) the action occurred under conditions giving rise to an inference of discrimination. Once Mr. Brown makes this showing, the burden shifts to Defendants to provide a legitimate, nondiscriminatory reason for its decision; if they do, the burden then shifts back to Mr. Brown once more to show that the proffered reason is merely a pretext for unlawful discrimination. *See Dawson v. Bumble & Bumble*, 398 F.3d 211, 216 (2d Cir. 2005).

At oral argument, counsel for Mr. Brown stated that his Title VII claim is premised on two adverse employment actions: (1) the failure to retain Mr. Brown in some capacity after his 098 application was denied in October 2006; and (2) the failure to rehire Mr. Brown once he received the 098 certificate in the fall of 2007. The Court will discuss each claimed basis; neither has merit.

As to the first claimed basis, the Defendants say that Mr. Brown cannot make out a prima facie case of discrimination, arguing that at the time of his termination, Mr. Brown was not qualified to teach at the Cady School because he did not have a 098 certificate. *See* Defs.' Mem. [doc. # 38] at 7-9; *see also Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 91-92 (2d Cir. 2001) (explaining that this prong of the prima facie case requires the plaintiff to prove only that he "possesses the basic

skills necessary for performance of [the] job.") (quoting *Owens v. New York City Housing Auth.*, 934 F.2d 405, 409 (2d Cir. 1991)) (alteration in original).  Were Mr. Brown arguing that the Defendants should have permitted him to continue in his position as a vocational instructor, the Court might agree that the lack of a 098 certification would prevent Mr. Brown from making out a prima facie case.  *See id.; Wilson v. N.Y. City Hous. Auth.*, No. 05CV6538, 2007 WL 1032262, at *6 (S.D.N.Y. Apr. 2, 2007) (examining Second Circuit precedent on when a plaintiff is considered "qualified" for purposes of the Title VII prima facie case); *Dep't of Trans. v. Comm'n on Human Rights & Opportunities*, 272 Conn. 457, 467-68 (2005) (holding that a plaintiff's failure to obtain a professional engineer license – "an absolute prerequisite to his promotion" – was a legitimate, nondiscriminatory reason for the defendant's decision to deny him the promotion).  But that is not what Mr. Brown argues; instead, he says that even after his 098 application was denied in October 2006, DCF should have permitted him to continue working in some capacity that did not require a 098 certificate – such as a substitute teacher or an instructional assistant – as it had been doing for the preceding six weeks.  Defendants' argument that Mr. Brown was not qualified to do what he had already been doing, then, is unavailing.  *See Slattery*, 248 F.3d at 91-92.

Accordingly, the Court will assume, without deciding, that Mr. Brown has made out a prima facie case of discrimination.  Under step two of the *McDonnell Douglas* test, Defendants have articulated a legitimate, non-discriminatory reason for its actions – namely, the denial of Mr. Brown's 098 certificate application in October 2006.  Mr. Brown does not dispute that, up to that point, DCF had allowed him to continue working (at full pay and benefits) in positions that did not require a 098 certificate.  *See* Defs.' Local Rule 56(a)1 Statement [doc. # 38-3] ¶ 17; Pl.'s Local Rule 56(a)2 Statement [doc. # 43] ¶ 17.  He also does not dispute that Ms. Gavey recommended that Mr.

11

Brown be allowed to keep working for DCF while his 098 application was pending, on the understanding that the application process "would take approximately 4-8 weeks." Defs.' Local Rule 56(a)1 Statement [doc. # 38-3] ¶ 16; Pl.'s Local Rule 56(a)2 Statement [doc. # 43] ¶ 16.  Mr. Brown also seems to concede that his failure to secure the 098 certificate would be a legitimate and non-discriminatory reason to terminate him; he merely disputes whether that was the real reason.  *See* Pl.'s Mem. [doc. # 44] at 16 ("Although the defendant was free to terminate plaintiff for [the lack of certification], they could not do so if the decision was motivated by a 'bad reason' such as plaintiff's age, race, or disability.").  Thus, the burden shifts back to Mr. Brown to produce evidence from which a jury could conclude that this proffered explanation is merely a pretext for illegal discrimination.  This he has not done.

Mr. Brown argues that he was treated differently than similarly-situated white teachers who also had certification issues.  If true, that would create an issue of material fact sufficient to defeat summary judgment.  *See, e.g., Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001).  However, the record is devoid of evidence supporting Mr. Brown's contention.  Instead, with regard to those white teachers that Mr. Brown has identified as similarly situated, the evidence demonstrates, in some cases, that Mr. Brown was treated better than they were; and, in other cases, that the other teachers were not actually similarly situated.

To be considered legitimate comparators, Mr. Brown must demonstrate that the other teachers were similarly situated to him "in all material respects." *Shumway v. UPS*, 118 F.3d 60, 64 (2d Cir. 1997); *see also McGuinness v. Lincoln Hall*, 263 F.3d 49, 53 (2d Cir. 2001).  As mentioned, in 2006 the DOE notified DCF that three of its teachers were not properly certified: Mr. Brown, Mr. Shirley, and Mr. Angelone.  Mr. Brown admits that Mr. Shirley either was certified or

12

received his 098 certification shortly after being notified. *See* Defs.' Local Rule 56(a)1 Statement [doc. # 38-3] ¶ 15; Pl.'s Local Rule 56(a)2 Statement [doc. # 43] ¶ 15. As for Mr. Angelone, he accepted a position at a different school, and thus, like Mr. Brown, he was not permitted to continue teaching at DCF without being properly certified. *See id.* While Mr. Angelone did later return to teach at the Cady School in 2008, he was rehired only after he had applied for and received his 098 certificate. *See* Aff. of Michael Angelone, Ex. 17 to Defs.' Mem. [doc. # 38] ¶¶ 2-4. Therefore, neither Mr. Angelone nor Mr. Shirley is an appropriate comparator to Mr. Brown.

The other potential comparators identified by Mr. Brown also were not similarly situated. *See* Pl.'s Mem. [doc. # 44] at 9. He says that two white men, Ray Wachtarz and Thomas Defillipo, "were put on the substitute list without a cut in pay during a period of time where there were no positions for them." *Id.* There are several problems with using either as a comparator. First, both were properly-certified to teach at the Cady School. *See* Aff. of John Mattera, Ex. C to Defs.' Reply Mem. [doc. # 46-2] ¶¶ 8-9. Second, while both were used intermittently as substitutes to cover for absent colleagues, this is common practice at the Cady School – and no doubt throughout the educational system – and neither was used principally as a substitute. *See id.* While Mr. Wachtarz was employed to undertake the short-term task of installing equipment in a new laboratory for the school, *see id.*, Mr. Brown was permitted to do the same thing in September 2006 while his 098 application was pending, *see* Defs.' Local Rule 56(a)1 Statement [doc. # 38-3] ¶ 17. Additionally, had Mr. Brown wished to be placed on the substitute list once he was no longer an employee of DCF – or, for that matter, to be employed as an instructional assistant – he merely had to apply for the position. Nonetheless, it is undisputed that Mr. Brown never applied for any position with DCF; this failure to apply is fatal to Mr. Brown's argument that DCF should have hired him for positions once

he was terminated.  *See, e.g.*, *Butts v. N.Y. City Dep't of Hous. Pres. & Dev.*, 307 Fed. Appx. 596, 598 (2d Cir. 2009) (summary order) ("[T]he district court properly found that Appellant failed to establish a prima facie case with respect to all of her failure-to-promote claims . . . because there was no evidence that Appellant formally applied for the positions in question.").

Moreover, it is further undisputed that DCF's application process is required by the collective bargaining agreement between DCF and the labor union.  *See* Defs.' Local Rule 56(a)1 Statement [doc. # 38-3] ¶ 24.  While Mr. Brown avers that exceptions are made to this policy, *see* Brown Aff., Ex. J to Pl.'s Mem. [doc. # 44] ¶ 12, the three examples he gives simply do not qualify as exceptions. Two of the alleged exceptions, Mr. Wachtarz and Mr. Defillipo, have already been discussed.  The third, Delia Rivera, a Latina woman, was no longer allowed to work as a pupil services specialist once her non-renewable certificate expired.  *See* Stipulation, Ex. D to Defs.' Reply [doc. # 46] ¶¶ 1-2. While she was attempting to secure a replacement certificate, Ms. Rivera was placed on unpaid administrative leave pursuant to a stipulation between DCF and the union.  *See id.* ¶ 2.  During this time, she did not accrue seniority and was only permitted to maintain her health care coverage on the condition that she pay the premiums.  *See id.* ¶ 5. When she was unable to secure a replacement certificate by a date certain, Ms. Rivera was considered by all involved to have resigned.  *See id.* ¶ 6; Aff. of Wanda Estrella, Ex. D to Defs.' Reply [doc. # 46] ¶ 2.  Ms. Rivera was subsequently re-employed by DCF in a different position – not requiring a certificate, but for which she was qualified by virtue of her master's degree – but she was hired through the same competitive process that DCF is required to go through for any vacant position.  *See id.* ¶ 4 ("In order to fill this position, the Department was required to post the position and use a competitive process to fill this position. Ms. Rivera was selected for the position through a competitive process.").

14

Unlike Ms. Rivera, who was required to go on unpaid leave while applying for a new certificate, Mr. Brown was permitted to continue working in a lower-level position with the same pay and benefits that he had been receiving while his application was pending.  It was only when he failed to secure his certificate, and when the school could no longer anticipate a timeframe for which he *would* receive his certificate, that Mr. Brown was terminated – just like Ms. Rivera, who was considered to have resigned when she could not secure her certificate by a date certain.  *See id.* ¶ 2 ("Pursuant to the stipulation entered into between the Ms. Rivera and her union, Ms. Rivera was separated from Employment with DCF on June 2, 2003.").  Thus, if anything, Mr. Brown was treated better than Ms. Rivera.

Essentially the same is true of Sarah Moore.  Like Ms. Rivera, Ms. Moore was placed on unpaid administrative leave once her conditional, non-renewable teaching certificate expired.  *See* Aff. of John Mattera, Ex. C to Defs.' Reply Mem. [doc. # 46-2] ¶ 6.  Unlike both Ms. Rivera and Mr. Brown, however, Ms. Moore successfully secured a certificate from the DOE, and was therefore allowed to continue teaching for DCF.  *See id.*  Of the three, only Mr. Brown was permitted to continue working while his application was pending.  Moreover, Ms. Moore, like Mr. Brown, is African-American, and thus even if she had been treated better than Mr. Brown – which she was not – one could not infer race discrimination on that basis alone.  *See Brown v. Henderson*, 257 F.3d 246, 253 (2d Cir. 2001); *cf. Jamieson v. Poughkeepsie City Sch. Dist.*, 195 F. Supp. 2d 457, 468 (S.D.N.Y. 2002).

While Mr. Brown complains that he was not placed on unpaid administrative leave, it is undisputed that he never requested this.  Instead, he asked only to be permitted to continue working in another position specially created by the school to accommodate him.  Absent evidence that DCF

15

routinely places teachers on unpaid administrative leave when they are seeking certification – and there is none[5] – one cannot infer discrimination from the school's failure to give Mr. Brown something he never requested.  *See, e.g.*, *Petrosino v. Bell Atlantic,* 385 F .3d 210, 228 (2d Cir. 2004); *Butts*, 307 Fed. Appx. at 598; *Perugini v. Stryker Orthopaedics*, No. 08CV404, 2009 WL 3254492, at *3 (D. Conn. Oct. 6, 2009); *Alphonse v. State of Conn. Dep't of Admin. Servs.*, No. 02CV1195, 2004 WL 904076, at *5 (D. Conn. Apr. 21, 2004).

As for the school's refusal to permit Mr. Brown to continue working in some other capacity for an indefinite period of time, Mr. Brown, as already discussed, identifies no precedent or policy that requires such an accommodation.  In this regard, Mr. Brown relies heavily on the statement by Mr. Mattera that, had Mr. Brown successfully secured a 098 certificate in October 2006, the school would have been able to find him a position.  *See* Mattera Dep., Ex. C. to Pl.'s Mem. [doc. # 44] at 17 (Question: "I thought you just said that if he got his 098 then he would have been able to continue teaching math?" Answer: "He would have been able to continue teaching.  We would have found something he could teach . . . in a comprehensive high school, which we are.").  But this is merely a reiteration of the understanding that Mr. Brown and the school reached in September 2006 – that if he secured his 098 certification, he would be permitted to keep teaching.  It may be the case that DCF could have found Mr. Brown a teaching position had he become properly certified.  But here again, one cannot infer race discrimination from DCF's failure to find Mr. Brown a teaching position for which he was not certified when all the evidence in the record suggests that DCF treated others

---

[5] If anything, the stipulation between DCF and the union regarding Ms. Rivera's situation suggests that placing individuals on unpaid administrative leave while they sought certification was not a routine matter.  *See* Stipulation, Ex. D to Defs.' Reply [doc. # 46] ¶ 9 ("This agreement is specific to Delia Rivera and will not be used as precedent in any other matter.").

similarly situated in the same manner (or worse).

The only other potential comparator identified by Mr. Brown is Ted Pinto.  Mr. Pinto did not have any issues with his certification.  Instead, Mr. Brown says that Mr. Pinto was treated more favorably with respect to discipline.  *See* Pl.'s Mem. [doc. # 44] at 23.  According to Mr. Brown, on July 20, 2006 his direct supervisor, Barbara Mule, verbally reprimanded him for playing checkers with students.  *See* Brown Aff., Ex. J to Pl.'s Mem. [doc. # 44] ¶ 5.  Mr. Brown seems to admit that this was a violation of school policy, but says that "other teachers who were not of my race have played checkers with students and have not been reprimanded, for example, Ted Pinto." *Id.*  When questioned about this subject during his deposition, Mr. Brown says that he knows from his personal observation that Ms. Mule witnessed Mr. Pinto playing checkers with students, *see* Brown Dep., Ex. A to Pl.'s Mem. [doc. # 44] at 46-47, but admits that he not know whether she ever spoke to Mr. Pinto about this or not, *see id.* at 46 (Question: "How do you know she didn't do anything?" Answer: "Well, he -- I don't know that but I believe that she didn't."); Pl.'s Local Rule 56(a)2 Statement [doc. # 43] ¶ 8 ("Cannot admit or deny whether other teachers disciplined or spoken to about safety issues.").  In fact, Ms. Mule testified at her deposition that she spoke to *all* teachers about these types of violations, *see* Dep. of Barbara Mule, Ex. B to Defs.' Reply [doc. # 46] at 26-27, and Mr. Brown has no admissible evidence to the contrary.  *See* Fed. R. Civ. P. 56(e)(2) (the party opposing summary judgment "may not rely merely on allegations or denials.").

Moreover, even if Ms. Mule did verbally reprimand Mr. Brown for this policy violation – and while she admits talking to him about it, she denies reprimanding him – there are several obstacles to inferring race discrimination on that basis.  As Ms. Mule explained at her deposition, the chess-playing incident with Mr. Brown had led to a fight between students, one of whom became

jealous when the student that was playing with Mr. Brown was not letting the other play quickly enough. *See* Dep. of Barbara Mule, Ex. B to Defs.' Reply [doc. # 46] at 7-8. Thus, even assuming that Ms. Mule did not speak to Mr. Pinto about playing chess with students – and again, there is no competent evidence of that fact – the fact that Mr. Brown's infraction caused a fight between students makes it materially different from even what Mr. Brown has alleged Mr. Pinto's situation involved. *See Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000) ("[T]he standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases," requiring an examination of "the context and surrounding circumstances in which those acts are evaluated.").

Furthermore, Mr. Brown's race discrimination claim is premised on his termination – not the alleged reprimands or other disciplinary actions. Mr. Brown tries to bootstrap DCF's alleged disciplinary actions into his termination-based discrimination claim by arguing that there is a causal connection between the two. *See* Pl.'s Mem. [doc. # 44] at 13-14. He argues that the result of him being singled out for disciplinary action in the summer of 2006 was that he was placed on probation, and concludes this argument by asserting that "[a] jury could find that the decision to terminate plaintiff, rather than consider any number of other possibilities that would have allowed him to remain employed, was affected by his probation status, which plaintiff claims was discriminatory." *Id.* at 14.

There are several fatal flaws in this argument. First, Mr. Brown has not produced any competent evidence that any other teacher was treated differently with regard to discipline than he was. Other than the previously-mentioned situation with Mr. Pinto, Mr. Brown fails to name any specific teacher whom he alleges was treated more favorably in disciplinary matters. In fact, Mr.

Brown admits in his Local Rule 56(a)2 Statement that he "[c]annot admit or deny whether other teachers [were] disciplined or spoken to about safety issues." Pl.'s Local Rule 56(a)2 Statement [doc. # 43] ¶ 8. Despite this admission, Mr. Brown nonetheless submits an affidavit in which he makes generalized assertions about how unnamed teachers of other races were not disciplined for behavior for which he received reprimands. *See* Brown Aff., Ex. J to Pl.'s Mem. [doc. # 44] ¶¶ 4-11. Contradictions aside, this is not the type of concrete evidence that suffices to defeat summary judgment. *See Nieves v. Angelo, Gordon & Co.*, 341 Fed. Appx. 676, 678 (2d Cir. 2009) (summary order) ("A plaintiff cannot defeat a summary judgment motion based on 'purely conclusory allegations of discrimination, absent any concrete particulars.'") (citation omitted).

Second, there is no evidence that Mr. Brown's "probation status" – even assuming Mr. Brown was placed on probation – had any impact whatsoever on the decision to terminate him for failing to have the required certification. Indeed, Mr. Brown admits that "the issues the defendants were having with plaintiff's safety issues in the classroom were placed on hold while plaintiff pursued getting the proper certification." Defs.' Local Rule 56(a)1 Statement [doc. # 38-3] ¶ 17; *see also* Pl.'s Local Rule 56(a)2 Statement [doc. # 43] ¶ 17 (admitting the quoted statement). Moreover, the fact that Mr. Brown similarly was terminated by the Stepping Stone school – where he apparently had no disciplinary issues – for his failure to have the 098 certificate severely undermines his speculation that his "probation status" at the Cady School was a factor in its decision.

Third, as already discussed, there is no evidence that were Mr. Brown of a different race (or age or any other factor), DCF would have done anything other than terminate him once his 098 certificate was denied. Although Mr. Brown asserts that "[t]here is no evidence in the record that DCF ever terminated another individual for failure to hold the proper certification," Pl.'s Mem. [doc.

19

# 44] at 14, that is not true, as already discussed in regards to Ms. Rivera.  And even it *were* true, it would be largely irrelevant, for it inverts the relevant burden – which remains at all times on Mr. Brown – and the relevant inquiry – which is whether DCF has ever *not* terminated someone in a situation comparable to Mr. Brown's.  *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) ("[T]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.") (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)); *Jamieson*, 195 F. Supp. 2d at 471 ("While the burden of production may shift, the burden of proving discriminatory intent remains always with the plaintiff.").

Fourth and finally, Mr. Brown's counsel conceded at oral argument that the decision to terminate him was a collective one, involving at least Ms. Gavey, Mr. Sullivan, and Mr. Mattera, and perhaps others.  Mr. Brown admits that there is no evidence that either of the first two were even aware of the alleged disciplinary issues, *see* Defs.' Local Rule 56(a)1 Statement [doc. # 38-3] ¶¶ 11, 13, but asserts that Mr. Mattera's animus "infected" the decision-making process.  Even assuming that Mr. Mattera harbored some type of unlawful animus (and again, there is no such evidence), Mr. Brown fails develop this argument by producing any evidence suggesting, for example, that the other members of the group deferred in any way to Mr. Mattera's views – or even, for that matter, what Mr. Mattera's (or anyone else's) views were at the meeting.  *See Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 786 & n.4 (2d Cir. 2007).  Without this type of evidence, the Court cannot imagine how Mr. Brown could carry his burden at trial.  *See id.*; *Baron v. New York City Dep't of Educ.*, No. 06CV2816, 2009 WL 1938975, at *6 (E.D.N.Y. July 7, 2009) ("[U]nder the so-called cat's paw theory of liability, the impermissible bias of a single individual can infect the entire group

of collective decisionmakers, at least when the decisionmakers are overly deferential to the biased individual's recommendations.") (citations and quotation marks omitted); *Jamieson*, 195 F. Supp. 2d at 473 (holding, in a case involving three board members who voted not to renew the plaintiff's contract, where there was only evidence of bias as to one of member, that "[n]o reasonable juror . . . could infer racial animus on the part of Halley and Monaco simply because their votes coincided with those of Samselski, against whom concrete allegations of racial animus have been raised. Plaintiff submits no evidence tending to show that either Halley's or Monaco's decision was dictated or influenced by Samselski's views. We do not countenance guilt by association; plaintiff asks the trier of fact to infer too much."); *see also Staub v. Proctor Hosp.*, 560 F.3d 647, 657 (7th Cir. 2009) (holding that, in so-called "cat's paw" cases, the court must make a threshold determination as to whether there is sufficient evidence to lead a reasonably jury to conclude that an adverse employment action taken by an admittedly-unbiased decisionmaker was so "singularly influenced" by a biased non-decisionmaker that the unlawful animus of the latter may be imputed to the former), *cert. granted*, 130 --- S.Ct. ---, 78 U.S.L.W. 3610 (Apr. 19, 2010).

In sum, there is no competent evidence even suggesting that any similarly-situated DCF employee was treated more favorably than Mr. Brown in any material way.   While the question of whether two employees are similarly situated is typically a question of fact, *see Graham*, 230 F.3d at 40, "this rule is not absolute . . . and a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met."  *Harlen Assocs.*, 273 F.3d at 499 n.2; *see also Cruz v. Coach Stores*, 202 F.3d 560, 568 (2d Cir. 2000).  This is just such a case. Accordingly, Defendants are granted summary judgment as to Count One, alleging race discrimination in violation of Title VII.

**IV.**

Although Connecticut generally construes the CFEPA to be identical to Title VII, *see Levy v. Comm'n on Human Rights & Opportunities*, 236 Conn. 96, 103 (1996), there is one difference that is material to Mr. Brown's CFEPA claim: the issue of sovereign immunity.  Although this distinction is not dispositive of Mr. Brown's claim, because Mr. Brown would lose a CFEPA claim against the State of Connecticut for all the reasons just stated in regards to the Title VII claim.  Nonetheless, the State has raised the sovereign immunity issue, and therefore the Court will address it here as an alternative holding on Mr. Brown's CFEPA claim.

Defendants argue that, under *Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89, 119-121 (1984), this Court's exercise of supplemental jurisdiction over state-law claims may not override the State's immunity to suits under the Eleventh Amendment.  *See  Allen v. Cuomo*, 100 F.3d 253, 260 (2d Cir. 1996); *Carvel v. Cuomo*, 357 Fed. Appx. 382, 383 (2d Cir. 2009) (summary order). They assert that while the CFEPA constitutes a waiver of the State's sovereign immunity, that waiver is effective only in Connecticut's own court system, and is inapplicable to suits brought in federal courts.  *See* Defs.' Mem. [doc. #38-2] at 4-5.  Mr. Brown, on the other hand, argues that the CFEPA constitutes a waiver of the State's sovereign immunity for cases brought in any court.  *See* Pl.'s Mem. [doc. # 44] at 12.

The provision of Connecticut law that creates the cause of action for violations of the CFEPA states that:

> Any person who has timely filed a complaint with the Commission on Human Rights and Opportunities in accordance with section 46a-82 and who has obtained a release from the commission . . . , may also bring an action *in the superior court* for the judicial district in which the discriminatory practice is alleged to have occurred or in which the respondent transacts business, except any action involving a state agency

or official may be brought in the superior court for the judicial district of Hartford. Conn. Gen. Stat. § 46a-100 (emphasis added). Section 46a-82, referenced above, permits "[a]ny person claiming to be aggrieved by an alleged discriminatory practice" – including violations of the CFEPA, Conn. Gen. Stat. § 46a-60 – to file a complaint with the CHRO.

In rebuttal to the State's sovereign immunity argument, Mr. Brown cites the 2009 Connecticut Supreme Court case of *Lyon v. Jones*, which held that that "§ 46a-100 represents an unambiguous waiver of sovereign immunity, authorizing actions against the state for alleged discriminatory employment practices in violation of § 46a-60." 291 Conn. 384, 397. Read in isolation, that passage would seem to support Mr. Brown's contention. However, while the Connecticut Supreme Court used broad language in that passage, there are good reasons to hesitate before interpreting *Lyon*'s holding as applying in federal court as well. In particular, and quite obviously, *Lyon* was in state court, and the issue of whether § 46a-100 also constitutes a waiver of sovereign immunity in federal court was neither before the Connecticut Supreme Court nor addressed by it. Applying *Lyon*'s holding to this case would thus require an extension of existing case law.

States are, of course, free to enact partial waivers of sovereign immunity, consenting to suits in their own courts, but not in the federal courts. *See Port Authority Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 306 (1990) ("A State does not waive its Eleventh Amendment immunity by consenting to suit only in its own courts, [citation omitted] and '[t]hus, in order for a state statute or constitutional provision to constitute a waiver of Eleventh Amendment immunity, it must specify the State's intention to subject itself to suit in *federal court*.'") (quoting *Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 241 (1985)) (emphasis in original); *Harper v. New York State Higher Educ.*

23

*Servs. Corp.*, 152 F.3d 918, 1998 WL 453688 (2d Cir. 1998) (same).  Moreover, as Defendants

rightly point out, "[t]he test for determining whether a State has waived its immunity from federal-

court jurisdiction is a stringent one," *Atascadero*, 473 U.S. at 241, and "waiver is found only where

stated 'by the most express language or by such overwhelming implications from the text as will

leave no room for any other reasonable construction.'"  *Richardson v. New York State Dep't of Corr.*

*Serv.*, 180 F.3d 426, 448 (1999) (quoting *Edelman v. Jordan*, 415 U.S. 651, 673 (1974)), *abrogated*

*on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006); *see also Huang*

*v. Johnson*, 251 F.3d 65, 69-70 (2d Cir. 2001); *see also Garris v. Dep't of Corr.*, 170 F. Supp. 2d

182, 187 (D. Conn. 2001) (Nevas, J.) ("A clear declaration of a state's intent to submit to matters in a

court, other than one of its own creation, must be found.").

Given the text of § 46a-100 – which only contemplates suits being brought in Connecticut's

"superior court" – the Court has a difficult time concluding that the CFEPA constitutes the type of

"unequivocal" waiver of immunity for suits filed in federal court that *Pennhurst* requires.  In fact,

prior to *Lyon*, a number of courts in this District had held that the CFEPA did *not* waive immunity

for suits in federal court.  *See, e.g.*, *Wagner v. Conn. Dep't of Corr.*, 599 F. Supp. 2d 229, 237 (D.

Conn. 2009) ("Under CFEPA, the State has waived its immunity only as to cases brought in the

Connecticut Superior Court.") (Droney, J.); *Vaden v. Conn.*, 557 F. Supp. 2d 279, 289 (D. Conn.

2008) ("[S]tate statutory provisions consenting to suit in state court, like CFEPA, are not waivers of

Eleventh Amendment immunity from suit in federal court.") (Arterton, J.); *Lyons v. Jones, et al.*, 168

F. Supp. 2d 1, 5 (D. Conn. 2001) ("The state has clearly waived immunity to claims brought under

CFEPA as to cases brought in the Connecticut state courts.  However, this court has found that there

is nothing in the Connecticut General Statutes that constitutes an express waiver of Eleventh

Amendment immunity for CFEPA claims.") (Hall, J.); *Garris,* 170 F. Supp. 2d at 187; *Walker v. Conn.*, 106 F. Supp. 2d 364, 370 (D. Conn. 2000) ("This Court declines Plaintiff's invitation to hold that simply because the State has consented to be sued in state court, it a fortiori must have meant to consent to federal jurisdiction also.") (Burns, J.).

That said, there is a post-*Lyon* decision in this District examining sovereign immunity; the court held, on the basis of *Lyon*, that the CFEPA *does* reflect the State's consent to suits in federal courts. *See Oppedisano v. S. Conn. State Univ.*, No. 07CV1693(WWE), 2009 WL 1605904, at * 3 (D. Conn. June 5, 2009) ("At the time that defendant filed its motion, it was an open question under Connecticut law whether section 46a-60 was a waiver of Connecticut's sovereign immunity. Since that time, the Connecticut Supreme Court has ruled that section 46a-60 constitutes such a waiver of the state's sovereign immunity. In light of this ruling, plaintiff's claim under CFEPA may go forward against the state university.") (citation omitted). As mentioned previously, even if this Court did find that the CFEPA waived immunity for suits in federal courts, Defendants would still be entitled to summary judgment on this claim for the same reasons that it is entitled to summary judgment on the Title VII claim. However, in the event that Mr. Brown appeals that determination and the Second Circuit agrees that it was in error, the Court holds as an alternative basis for granting summary judgment to Defendants on the CFEPA claim (Count Two) that the CFEPA does not constitute a waiver of the State's Eleventh Amendment immunity for lawsuits in federal court. For the reasons explained above, the Court does not believe that the text of the CFEPA is sufficiently clear for this Court to conclude otherwise; insofar as *Oppedisano* is to the contrary, this Court declines to follow it. *See, e.g.*, *Minotti v. Lensink*, 798 F.2d 607, 611 (2d Cir. 1986) (ordering a case dismissed despite a Connecticut statute unmistakably waiving sovereign immunity in certain

specified civil actions, because the statute's language did not "explicitly . . . waive immunity to suit

in federal court"); *Galusha v. New York State Dep't of Envtl. Conservation*, 92 F. Supp. 2d 66, 69-70

(N.D.N.Y. 1999); *Jehnsen v. New York Martin Luther King, Jr. Inst. for Nonviolence*, 13 F. Supp. 2d

306, 311 (N.D.N.Y. 1998) (dismissing a case against an entity that state law said "may sue and be

sued, complain, and defend in any court of competent jurisdiction," N.Y. Exec. Law § 323(10),

because the statute "does not specify that the [defendant] may sue or be sued in *federal court*, [and

therefore] it is evident that there has been no waiver of sovereign immunity") (emphasis added).

## V.

Count Three of the Complaint [doc. # 1] asserts a claim under 42 U.S.C. § 1983 for race, age,

and disability discrimination in violation of the Equal Protection Clause of the U.S. Constitution.

*See* Compl. [doc. # 1].[6]   The Supreme Court has advised that the Equal Protection Clause "is

essentially a direction that all persons similarly situated should be treated alike."  *City of Cleburne v.*

*Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985).   "Once action under color of state law is

established," – and there is no dispute as to this element – "the analysis for such claim is similar to

that used for employment discrimination claims brought under Title VII, the difference being that a

§ 1983 claim, unlike a Title VII claim, can be brought against individuals."  *Demoret v. Zegarelli*,

451 F.3d 140, 149 (2d Cir. 2006) (citations omitted).   In order to establish an equal protection

violation, Mr. Brown must demonstrate that: "(1) in comparison with others similarly situated, [he]

---

[6] Count Four of the Complaint alleges a violation of 42 U.S.C. § 1981.  Mr. Brown concedes that 42 U.S.C. § 1983 is the proper avenue for vindicating rights protected by § 1981, *see* Pl.'s Mem. [doc. # 44] at 21-22; *Patterson v. County of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004), and requests permission to amend his Complaint to include his § 1981 claim under § 1983.  But given that Mr. Brown's § 1981 claim merely reiterates one of the bases already included within his § 1983 claim – namely, discrimination on the basis of race – there is no need to do so.  Accordingly, the Court

was selectively treated, and (2) that such selective treatment was based on impermissible considerations . . . ." *Diesel v. Town of Lewisboro*, 232 F.3d 92, 103 (2d Cir. 2000) (citation omitted). Each prong of this test is applied separately, and "the failure to satisfy either inquiry [is] fatal to the plaintiff's claim." *A.B.C. Home Furnishings, Inc. v. Town of East Hampton*, 964 F. Supp. 697, 702 (E.D.N.Y. 1997); *see also Zahra v. Town of Southold*, 48 F.3d 674, 684 (2d Cir. 1995) (holding that even when a plaintiff presents evidence of selective treatment, summary judgment is still appropriate if there is no evidence of malice or bad faith). Mr. Brown has failed to present competent evidence sufficient to defeat summary judgment on either of the two prongs of the test for alleged equal protection violations.

As for the selective treatment prong,

> The test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated. Much as in the lawyer's art of distinguishing cases, the "relevant aspects" are those factual elements which determine whether reasoned analogy supports, or demands, a like result. Exact correlation is neither likely nor necessary, but the cases must be fair congeners. In other words, apples should be compared to apples.

*A.B.C. Home Furnishings*, 964 F. Supp. at 702 (citation omitted). Mr. Brown's claim of race and age discrimination in violation of the Equal Protection Clause fails for the same reasons already exhaustively outlined above in considering his Title VII claim. In short, he has not presented evidence that any other similarly-situated DCF employee was treated differently than he was; therefore, there is no basis from which a jury could infer that selective treatment was on account of Mr. Brown's race or age.[7]

_____

grants summary judgment to Defendants on Count Four. *See Patterson*, 375 F.3d at 225.

[7] Though Mr. Brown has not sought to proceed under a "class of one" theory – in which he would not necessarily have to prove that he was treated differently based on his membership in a particular

The claim of disability discrimination fails for the same reasons, plus at least one more: there is no evidence that any of the Defendants knew that Mr. Brown was disabled. The Court takes no issue with Mr. Brown's claim that he is disabled. But that fact, standing alone, is not enough to suggest a violation of equal protection. At a bare minimum, Mr. Brown must produce evidence from which a jury could infer that any of the Defendants actually knew he was a member of the class of individuals considered disabled. *See Engquist*, 128 S.Ct. at 2156. Otherwise, it would be impossible for a jury to infer that any actions they took were "because of" his status as a disabled person. *See Raytheon Co. v. Hernandez*, 540 U.S. 44, 55 n.7 (2003) ("[I]if [an employer] were truly unaware that . . . . a disability existed, it would be impossible for [the adverse employment] decision to have been based, even in part, on respondent's disability."); *Sista v. CDC Ixis N. Am., Inc*., 445 F.3d 161, 169 (2d Cir. 2006) (discussing the causation requirement in the context of the Americans with Disabilities Act); *Pace v. Paris Maint. Co.*, 107 F. Supp. 2d 251, 262 (S.D.N.Y. 2000) ("Without knowledge of [plaintiff]'s disability, it is logically impossible that Defendants removed [plaintiff] . . . as a result of his disability.").

The only evidence that Mr. Brown has that anyone at DCF was aware of his disabilities is his single conversation with Mr. Mattera, in which Mr. Mattera allegedly asked Mr. Brown whether he was ill. *See* Dep. of Noah Brown, Ex. A to Pl.'s Mem. [doc. # 44] at 58. Even assuming that the conversation was precisely in line with Mr. Brown's rather hazy recollection of it, *see id.*, it is a

---

class or group, but merely that he was singled out for arbitrary treatment – the Court notes that in 2008, the Supreme Court held that this theory of liability for equal protection violations is unavailable in the context of public employment. *See Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 128 S.Ct. 2146, 2154 (2008); *Appel v. Spiridon*, 531 F.3d 138, 139-40 (2d Cir. 2008) (per curiam). Therefore, Mr. Brown must allege and prove that Defendants took adverse action against him "on the basis of [his] membership in some class or group." *Engquist*, 128 S.Ct. at 2156.

28

remarkable leap from Mr. Mattera asking whether Mr. Brown was ill – which Mr. Brown denied – to

inferring that Mr. Mattera considered Mr. Brown to be *disabled*.  It is well established in the ADA

context that an employer's knowledge of an employee's limitations or symptoms does not provide

proof that the employer knew that the condition or symptoms were disabling.  *See, e.g.*, *Reeves v.*

*Johnson Controls World Servs.*, 140 F.3d 144, 153 (2d Cir. 1998); *Cozzi v. Great Neck Union Free*

*Sch. Dist.*, No. 05CV1389, 2009 WL 2602462, at *14 (E.D.N.Y. Aug. 21, 2009); *Kolivas v. Credit*

*Agricole*, No. 95CV5662, 1996 WL 684167, at *5 (S.D.N.Y. Nov. 26, 1996) (employer's knowledge

that plaintiff "had just seen a psychiatrist, had been prescribed medication, was depressed, and

needed a week off from work" was insufficient to alert employer that plaintiff was disabled).

Moreover, even if Mr. Mattera somehow knew that Mr. Brown was disabled because of his

PTSD and/or depression, Mr. Brown has not adduced any evidence whatsoever that this had any

bearing on the decision to terminate him.  *See Pace*, 107 F. Supp. 2d at 262 (finding that plaintiff

failed to make out prima facie case, even assuming defendants knew of his disability, where the

record demonstrated no link between the adverse employment action and plaintiff's condition).  As

the evidence recited above demonstrates, Mr. Brown was terminated because he lacked the required

certification, and the Defendants could not know whether he would be able to reapply and obtain it

within a reasonable timeframe.  In sum, there is simply no evidence from which a reasonable jury

could conclude that Mr. Brown was discriminated against because he was disabled; accordingly,

Defendants are granted summary judgment on Count Three.

### IV.

The Court reaches the same conclusion as to Count Six, which alleges a violation of Section

504 of the Rehabilitation Act, 29 U.S.C. § 794(a).  Section 504 of the Rehabilitation Act provides

that "no otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." To make out a prima facie case, Mr. Brown must show: (1) that he is a qualified individual with a disability; (2) that DCF is subject to the Rehabilitation Act; and (3) that he was denied the opportunity to participate in or benefit from DCF's services, programs, or activities, or was otherwise discriminated against by DCF because of his disabilities.  *See Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003).

There is no question that DCF is subject to the Rehabilitation Act, and the Court assumes without deciding that Mr. Brown is a "qualified individual."  *See Weixel v. Bd. of Educ. of N.Y.*, 287 F.3d 138, 147 (2d Cir. 2002) (discussing when one is considered a "qualified individual" under the Rehabilitation Act).  But as already discussed in regards to Mr. Brown's equal protection claim, the record is devoid of evidence suggesting: (a) that anyone at DCF knew he was disabled; or (b) that even if DCF knew that Mr. Brown was disabled, that this had anything to do with the decision to separate him from his employment.  Accordingly, Defendants are granted summary judgment on Count Six.

## V.

Mr. Brown's final claim, Count Seven, alleges a violation of Title II of the Americans with Disabilities Act (ADA).  Mr. Brown admits that he did not allege discrimination based on disability in his CHRO complaint, which is required for him to bring a claim under the provision of Title I of the ADA that prohibits discrimination in employment.  Instead, he brings his claim under Title II of the ADA, likely because it, unlike Title I, does not require exhaustion.  Title II of the ADA states

30

that: "Subject to the provisions of this title, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

As both parties point out, despite multiple opportunities to clarify the law, the Second Circuit has not yet decided whether claims of discrimination in employment are cognizable under Title II of the ADA. *See Mullen v. Rieckhoff*, 189 F.3d 461, 1999 WL 568040 (2d Cir. 1999) (summary order). District courts within the Second Circuit have gone both ways on this issue. That said, the Supreme Court case of *Board of Trustees of the University of Alabama v. Garrett*, 531 U.S. 356 (2001), appears to be a rough and informal dividing line; in the years before (and in the year immediately after) *Garrett*, district courts in the Second Circuit tended to permit employment discrimination claims under Title II to proceed. *See, e.g.*, *Winokur v. Office of Court Admin.*, 190 F. Supp. 2d 444 (E.D.N.Y. 2002); *Simms v. City of New York*, 160 F. Supp. 2d 398 (E.D.N.Y. 2002); *Worthington v. City of New Haven*, No. 94CV609, 1999 WL 958627 (D. Conn. Oct. 5, 1999); *Magee v. Nassau County Med. Ctr.*, 27 F. Supp. 2d 154 (E.D.N.Y. 1998); *Hernandez v. City of Hartford*, 959 F. Supp. 125, 133 (D. Conn. 1997); *Rome v. MTA/New York City Transit*, No. 97CV2945, 1997 WL 1048909 (E.D.N.Y. Nov. 18, 1997); *Graboski v. Guiliani*, 937 F. Supp. 258 (S.D.N.Y. 1996); *Finley v. Giacobbe*, 827 F. Supp. 215 (S.D.N.Y. 1993).

While the *Garrett* Court initially granted *certiorari* on the constitutionality of Title II of the ADA as well as Title I, it dismissed, in a footnote, the Title II portion of the writ as improvidently granted after the briefs did not sufficiently address:

[T]he question [of] whether Title II of the ADA, dealing with the 'services, programs,

31

> or activities of a public entity,' 42 U.S.C. § 12132, is available for claims of employment discrimination when Title I of the ADA expressly deals with that subject.  *See, e.g., Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion" (internal quotation marks omitted)).

*Garrett*, 531 U.S. at 360 n.1.  In the last several years, many district courts in this Circuit have read the *Garrett* Court's citation to *Russello* as an indication that it would not have permitted employment discrimination claims to proceed under Title II.  In so doing, many have explicitly adopted the reasoning of the Ninth Circuit decision in *Zimmerman v. Oregon Department of Justice*, 170 F.3d 1169, 1173 (9th Cir. 1999), which held that "Congress unambiguously expressed its intent for Title II not to apply to employment."  *See, e.g., Fleming v. State Univ. of N.Y.*, 502 F. Supp. 2d 324, 333 (E.D.N.Y. 2007); *Cormier v. City of Meriden*, No. 03CV1819, 2004 WL 2377079, at *4 (D. Conn. Sept. 30, 2004) ("[T]he Court is persuaded that the overall context of Title II compels the conclusion that employment discrimination claims are not cognizable under that provision."); *Syken v. N.Y. Exec. Dep't, Div. of Hous. & Comm. Renewal*, No. 02CV4673, 2003 WL 1787250 (S.D.N.Y. Apr. 2, 2003) ("Title II does not apply to employment discrimination claims."); *Sworn v. W. N.Y. Children's Psychiatric Ctr.*, 269 F. Supp. 2d 152, 157 (S.D.N.Y. 2003) ("[P]laintiff should not be permitted to circumvent the holding of *Garrett*, which immunizes states from employment discrimination claims brought pursuant to Title I of the ADA, by commencing suit under Title II, a subchapter which lacks any of the procedural protections afforded employers under Title I."); *Filush v. Town of Weston*, 266 F. Supp. 2d 322, 330 (D. Conn. 2003) ("Congress did not intend for Title II to apply to employment."); *but see Transp. Workers Union v. N.Y. City Trans. Auth.*, 342 F. Supp. 2d 160, 173 (S.D.N.Y. 2004) ("Given the broad congressional mandate, it is certainly at least a plausible reading

32

of Title II that it covers employment discrimination."); *Coleman v. Town of Old Saybrook*, No. 03CV1275, 2004 WL 936174, at \*3 (D. Conn. Apr. 28, 2004) (agreeing with *Transp. Workers Union* that "Title II does cover employment discrimination").

This Court previously considered this very issue in *Ayantola v. Community Technical Colleges of Connecticut Board of Trustees*, No. 05CV957, 2007 WL 963178, at \*2 (D. Conn. Mar. 30, 2007), concluding that "Title II of the ADA does not apply to employment actions, which must be brought under Title I of that Act."  The Court sees no reason to reexamine that conclusion, and adheres to it here.

That said, even were the Court to hold that Mr. Brown could assert his disability discrimination in employment claim under Title II of the ADA, that would not change the outcome of this case.  Claims of disability discrimination under the ADA are held to essentially the identical standard as is applied under Section 504 of the Rehabilitation Act.  *See Henrietta*, 331 F.3d at 272. Thus, Mr. Brown's ADA claim – even assuming it could be asserted under Title II – would fail for the same reasons already discussed with regard to the Rehabilitation Act claim.  Therefore, Defendants are granted summary judgment on Count Seven.

## VI.

For the foregoing reasons, the Defendants' Motion for Summary Judgment [doc. # 38] is GRANTED as to all claims and all Defendants.  **The Clerk shall enter judgment for all Defendants and close this file.**

IT IS SO ORDERED,


/s/ Mark R. Kravitz_____
    United States District Judge


**Dated at New Haven, Connecticut: May 26, 2010.**